**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK
28 Liberty Street
New York, NY 10005;

STATE OF NEW JERSEY
25 Market Street
Trenton, NJ 08625;

STATE OF CONNECTICUT
165 Capitol Avenue
Hartford, CT 06106;

STATE OF DELAWARE
Carvel State Office Building, 5th Floor
820 North French Street
Wilmington, DE 19801;

STATE OF MAINE
6 State House Station
Augusta, ME 04330;

COMMONWEALTH OF MASSACHUSETTS
1 Ashburton Place
Boston, MA 02108;

STATE OF RHODE ISLAND
150 South Maine Street
Providence, RI 02903; and

STATE OF VERMONT
109 State Street
Montpelier, VT 05609,

Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, NW
Washington, DC 20240;

C.A. No. 1:26-cv-05851

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

DOUGLAS J. BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240;

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street, NW
Washington, DC 20240;

MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management
1849 C Street, NW
Washington, DC 20240;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530;

TODD BLANCHE, in his official capacity as Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530;

STANLEY WOODWARD, in his official capacity as Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530; and

BLUEPOINT WIND, LLC, as an interested party
3 Center Plaza, Suite 205
Boston, MA 02108,

Defendants.

Plaintiffs the State of New York, the State of New Jersey, the State of Connecticut, the State of Delaware, the State of Maine, the Commonwealth of Massachusetts, the State of Rhode Island, and the State of Vermont (together, the States), as and for their complaint, allege as follows, upon information and belief,

against defendants the U.S. Department of the Interior (Interior); Douglas Burgum, Secretary of the Interior (the Interior Secretary), in his official capacity; the Bureau of Ocean Energy Management (BOEM); Matthew Giacona, Acting Director of BOEM, in his official capacity (together with previously listed defendants, Interior Defendants); the U.S. Department of Justice (DOJ); Todd Blanche, Attorney General, in his official capacity; Stanley Woodward, Associate Attorney General, in his official capacity (together with all previously listed defendants, Federal Defendants); and Bluepoint Wind, LLC (Bluepoint), as an interested party:

## INTRODUCTION

1. The Trump Administration has once again misused the Judgment Fund to unlawfully pay an offshore wind developer to abandon its lease and to fund oil and gas development without any congressional appropriation for that purpose.

2. In this lawsuit, the States challenge Federal Defendants' execution and implementation of a purported "settlement agreement" (the Settlement Agreement[1]) between the United States and Bluepoint that unlawfully cancels offshore wind lease number OCS-A 0537 (the Lease); pays Bluepoint $765 million from the Judgment Fund; and requires Bluepoint to spend that $765 million on so-called "conventional energy projects," i.e., oil and gas projects, that the Trump Administration favors.

[1] Even though the Settlement Agreement is not a compromise settlement agreement reached by adverse parties, Federal Defendants refer to it as such, so the States will use the term "Settlement Agreement" to avoid confusion.

3. Bluepoint won the Lease in a competitive auction in 2022, paying $765 million for approximately 71,000 acres in the New York Bight, a shallow area of the Atlantic Ocean between the coasts of New York and New Jersey.

4. While Federal Defendants invoke nebulous "national security issues" to justify terminating the Lease and misappropriating money from the Judgment Fund, any legitimate national security issues were already accounted for in BOEM's original decision to award the Lease. The Lease was awarded to Bluepoint following years of extensive consultation with the Department of Defense (DOD)[2] to ensure that any national security concerns resulting from offshore wind development in the Lease area were appropriately addressed and that any impacts would be appropriately avoided or mitigated.

5. The project that Bluepoint intended to build in the Lease area was anticipated to have the capacity to generate 2.4 gigawatts of electricity, enough to power approximately 1.5 million New York and New Jersey homes.

6. New York and New Jersey relied on the development of the Lease area to advance their strategies to meet electricity demand and to enhance grid reliability, diversify their energy supply, and achieve their statutory climate and renewable energy goals. The Lease area was expected to serve New York City and the

[2] On September 5, 2025, President Trump issued an executive order seeking to change the name of this federal agency from the Department of Defense to the Department of War. Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sep. 10, 2025). This complaint uses "Department of Defense" or "DOD."

surrounding area, which is in significant need of additional electricity, with severely limited options to meet growing demand.

7. The development of this Lease area also would have benefited Connecticut, Maine, Massachusetts, Rhode Island, and Vermont (the New England States) and Delaware. These States regularly import energy from New York through high-voltage interconnection to meet rising energy demand. In addition, all these States maintain Renewable Portfolio Standards that require electricity providers to purchase Renewable Energy Certificates/Credits (RECs). Development of the Lease area could help these States meet rising demand for electricity, satisfy their Renewable Portfolio Standards, and reduce the prices that electricity suppliers in these states pay for RECs.

8. Since the beginning of President Trump's second term, however, the Administration has continually attempted to kill the offshore wind industry. President Trump has stated that "my goal is to not let any windmill be built,"[3] and Secretary Burgum has promised that "[u]nder this administration, there is not a future for offshore wind."[4]

---

[3] Tamara Keith, *Trump Takes Aim at Windmills Despite Increasing Energy Costs*, NPR (Mar. 24, 2026, at 5:00 AM), https://www.npr.org/2026/03/24/nx-s1-5684158/trump-takes-aim-at-windmills-despite-increasing-energy-costs. While the President stated his opposition to windmills, which use wind for mechanical tasks like grinding grain or pumping water, it appears from context that he was referring to wind turbines, which use wind to generate electricity.

[4] Spencer Kimball, *Offshore Wind Has No Future in the U.S. Under Trump Administration, Interior Secretary Says*, CNBC (Sep. 11, 2025, at 9:45 AM; updated 3:04 PM), https://perma.cc/Z36U-V7Q8.

9. The current Administration has repeatedly broken the law in trying to achieve this objective. For example, in January 2025, President Trump issued a presidential memorandum that purported to impose a categorical and indefinite freeze on all federal permitting for offshore and onshore wind energy. That permitting freeze was found to be unlawful: in December 2025, a federal district court vacated federal agency actions implementing the memorandum after finding that these actions were arbitrary, capricious, and contrary to law, a decision as to which the federal government ultimately did not pursue an appeal.

10. On the heels of that judicial defeat, the Trump Administration tried again to kill offshore wind—this time by issuing suspension orders to projects already under construction. In December 2025, BOEM ordered five offshore wind projects under development on the East Coast to "suspend all ongoing activities related to [projects] on the Outer Continental Shelf for the next 90 days for reasons of national security."[5] Again, the Administration's efforts to halt offshore wind development were found to be unlawful: in January and February 2026, federal district courts stayed or preliminarily enjoined all five suspension orders, finding that the classified information the courts reviewed *in camera* did not identify any imminent national security risk.

[5] BOEM, Acting Director's Orders to Suspend All Ongoing Activities, Issued to Equinor (Empire Leaseholder LLC), Orsted N. Am. Inc. (Revolution Wind LLC and Sunrise Wind LLC), Vineyard Wind 1 LLC, and Va. Elec. & Power Co. (OSW Project LLC) (Dec. 22, 2025), https://perma.cc/92E3-27XF.

11. When these efforts failed, the Trump Administration tried a new tack: taking money from the Judgment Fund, a permanent appropriation for the payment of judgments against and settlements with the United States, to pay offshore wind developers to walk away. In March 2026, Interior announced that it had reached so-called "settlement agreements" with French energy company TotalEnergies to terminate both of its offshore wind leases on the Outer Continental Shelf in exchange for a payment of $928 million—the amount the company's subsidiaries originally paid for the leases—and a commitment by TotalEnergies to reinvest that $928 million in oil and gas development.

12. One month later, Federal Defendants repeated this maneuver. On April 27, 2026, Interior announced that it had reached an agreement with Bluepoint to terminate the Lease and reimburse the company $765 million from the Judgment Fund. As with TotalEnergies, the Settlement Agreement requires the developer to redirect that money to oil and gas development. According to Federal Defendants, this arrangement constitutes a "settlement" of a hypothetical lawsuit that Bluepoint would have initiated if BOEM had ordered it to suspend operations in the Lease area.

13. These are not the only instances in which Federal Defendants have used the Judgment Fund to terminate offshore wind projects. As of September 22, 2026, Federal Defendants have, in violation of law, committed to pay more than $4 billion in taxpayer money from the Judgment Fund to cancel offshore wind leases in return for reinvestment of the money in oil and gas development and other energy projects the Administration prefers.

14. Paying offshore wind developers billions of dollars to *not* build new planned sources of generation restricts the supply of electricity at a time of increasing demand and flouts the separation of powers established under the U.S. Constitution. Instead of allowing offshore wind developers to deliver new sources of electricity to the States, Federal Defendants have illegally deprived the States of those new projects to advance the President's unfunded policy objective of promoting oil and gas development in other parts of the country.

15. The Bluepoint Lease cancellation should be held unlawful and set aside pursuant to the Administrative Procedure Act (the APA), 5 U.S.C. § 706(2)(A), (D), because it is arbitrary and capricious, is not in accordance with law, and occurred without observance of procedure required by law.

16. The Lease cancellation is arbitrary and capricious because Interior Defendants failed to (1) provide a reasoned explanation for cancelling the Lease; (2) explain their change in position or account for New York and New Jersey's reliance interests; (3) address alternative means of achieving their objectives; or (4) provide a genuine justification for their actions.

17. The Lease cancellation is not in accordance with law and is without observance of procedure required by law in violation of the APA because it violates the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*. It is a major federal action affecting the quality of the human environment, requiring Interior Defendants to consider the impacts of and alternatives to their action, which they failed to do.

18. The Lease cancellation also violates the APA and the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1349(a)(1), because it is not in accordance with OCSLA or the procedures OCSLA requires. Interior Defendants (1) did not hold a hearing before cancelling the Lease or make the required determination that cancellation is required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) agreed to pay Bluepoint the Lease's purchase price without calculating whether that would be the fair market value at the time of cancellation, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (3) did not consider the factors they were required to consider under 43 U.S.C. § 1337(p)(4) and 40 C.F.R. § 585.102 or otherwise demonstrate grounds for departing from regulations pursuant to 30 C.F.R. § 585.103; and (4) did not notify or coordinate with the Governors of the affected States in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

19. For these same reasons, the Settlement Agreement that precipitated the Lease cancellation also violates OCSLA, 43 U.S.C. § 1349(a)(1), and is not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2)(A).

20. The Settlement Agreement is further not in accordance with law because it violates the Judgment Fund Act, Antideficiency Act, Purpose Statute, and Miscellaneous Receipts Act. The Settlement Agreement violates the Judgment Fund Act, 31 U.S.C. § 1304, because the $765 million promised to Bluepoint (1) is a type of payment otherwise provided for by law, namely, OCSLA, and (2) is not the result of a compromise settlement between adverse parties, but rather an agreement resulting

from Interior Defendants' pretextual national security concerns and Bluepoint's desire to receive unauthorized compensation for an expensive offshore wind lease. The Agreement violates the Antideficiency Act, Purpose Statute, and Miscellaneous Receipts Act because Federal Defendant's unlawful payment of money that Congress never appropriated contravenes the separation of powers that these statutes are designed to safeguard.

21. The Settlement Agreement is also contrary to constitutional authority, in violation of the separation of powers doctrine, the Spending Clause, the Appropriations Clause, and the APA.

22. Finally, the Settlement Agreement is in excess of statutory authority, 5 U.S.C. § 706(2)(C), and *ultra vires* because no statute authorizes Federal Defendants to use a sham settlement agreement to unlawfully cancel an offshore wind lease and redirect the money paid for the lease to a separate, unauthorized use favored by the President.

23. The States seek an order: (1) declaring that the Lease cancellation and Settlement Agreement violate the APA, NEPA, OCSLA, the Judgment Fund Act, the Antideficiency Act, the Purpose Statute, and the Miscellaneous Receipts Act; (2) compelling compliance with OCSLA; (3) vacating and setting aside the Lease cancellation and Settlement Agreement; (4) enjoining Federal Defendants from taking further action with respect to the Lease cancellation and Settlement Agreement; and (5) granting such further relief as the Court deems just and proper, including, but not limited to, attorneys' fees and costs.

## PARTIES

24. Plaintiff State of New York is a sovereign State in the United States of America and is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

25. Plaintiff State of New Jersey is a sovereign State in the United States of America and is represented by Attorney General Jennifer Davenport, who is the chief law enforcement officer of New Jersey.

26. Plaintiff State of Connecticut is a sovereign State in the United States of America and is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Connecticut General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

27. Plaintiff State of Delaware is a sovereign State in the United States of America and is represented by Attorney General Kathleen Jennings, who is the chief law enforcement officer of Delaware.

28. Plaintiff State of Maine is a sovereign State in the United States of America and is represented by Attorney General Aaron M. Frey, who is the chief law enforcement officer of Maine.

29. Plaintiff Commonwealth of Massachusetts is a sovereign State in the United States of America and is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

30. Plaintiff State of Rhode Island is a sovereign State in the United States of America and is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

31. Plaintiff State of Vermont is a sovereign State in the United States of America and is represented by Attorney General Charity R. Clark, who is the chief law enforcement officer of Vermont.

32. Defendant Interior is a cabinet agency within the executive branch of the United States government. Interior has responsibility over leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA and its implementing regulations.

33. Defendant Douglas Burgum is the Interior Secretary and Interior's highest-ranking official. He is sued in his official capacity. Interior Secretary Burgum is the federal official ultimately responsible for the management and oversight of leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA and for all official actions or inactions of Interior and BOEM challenged in this action.

34. Defendant BOEM is a bureau within Interior. BOEM is responsible for the administration, leasing, and permitting of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA.

35. Defendant Matthew Giacona is the Acting Director of BOEM and BOEM's highest-ranking official. He is sued in his official capacity.

36. Defendant DOJ is a cabinet agency within the executive branch of the U.S. government. DOJ possesses litigation and settlement authority on behalf of Interior and, consequently, is responsible for submitting Judgment Fund requests on Interior's behalf.

37. Defendant Todd Blanche is Attorney General and DOJ's highest-ranking official. He is sued in his official capacity.

38. Defendant Stanley Woodward is Associate Attorney General and DOJ's second highest-ranking official. He is sued in his official capacity.

39. Bluepoint is a limited liability company that held the Lease. It is joined as an interested party whose legal rights and obligations may be affected by the relief requested in this litigation.

## JURISDICTION AND VENUE

40. This Court has subject matter jurisdiction over this case because it arises under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, namely: the APA, 5 U.S.C. § 706; OCSLA, 43 U.S.C. § 1349; NEPA, 42 U.S.C. §§ 4321 *et seq.*; the Judgment Fund Act, 31 U.S.C. § 1304; the Antideficiency Act, 31 U.S.C. § 1341(a)(1)(A); the Purpose Statute, 31 U.S.C. § 1301(a); and the Miscellaneous Receipts Act, 31 U.S.C. § 3302(b)–(c). The Court also has jurisdiction under the citizen suit provision of OCSLA, 43 U.S.C. § 1349.

41. The Court has personal jurisdiction over all defendants and interested parties because they purposefully directed conduct at this district, including at the New York Bight.

42. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) and 43 U.S.C. § 1349(b)(1). Plaintiff the State of New York resides in this district, 28 U.S.C. § 1319(e)(1)(C), and Federal Defendants, as United States officers and agencies sued in their official capacities, "may be found" in this district, 43 U.S.C. § 1349(b)(1); *see Superior Oil Co. v. Andrus*, 656 F.2d 33, 35 (3d Cir. 1981).

## LEGAL BACKGROUND

### I. The Outer Continental Shelf Lands Act

43. OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public" and asserts that "the rights and responsibilities of all States . . . to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized." 43 U.S.C. § 1332(3), (5). The law directs the Interior Secretary to facilitate its "expeditious and orderly development" while maintaining competition and environmental safeguards. *Id.* § 1332(3).

44. In 2005, Congress amended OCSLA to authorize the Interior Secretary to issue leases on the Outer Continental Shelf for renewable energy production. *See* Energy Policy Act of 2005, Pub. L. No. 1099-58, § 388, 1199 Stat. 5994, 744–47. In doing so, Congress sought to "enhance the energy security of the United States," "decrease dependance on foreign sources of fuel," S. Rep. No. 109-78, at 1 (2005), and "ensure jobs for our future with secure and reliable energy," H.R. Rep. No. 109-215, at 1 (2005).

45. To those ends, OCSLA provides detailed requirements for leasing and developing Outer Continental Shelf lands, including, as relevant here, specific procedures that must be followed to cancel or relinquish a lease.

46. Pursuant to OCSLA, the Interior Secretary, in consultation with relevant federal agencies, may "grant a lease, easement, or right of way" for activities that "produce or support production, transportation, storage, or transmission of

energy sources other than oil and gas," including offshore wind. 43 U.S.C. §§ 1337(p)(1)(C), 1356c. The Interior Secretary "shall ensure that any activity" authorized "is carried out in a manner that provides for" twelve enumerated factors, including safety, protection of the environment, prevention of waste, protection of national security interests of the United States, and prevention of interference with other reasonable uses of the Outer Continental Shelf. *Id.* § 1337(p)(4). The Interior Secretary shall also "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5), "shall provide for coordination and consultation with the Governor of any State . . . that may be affected by a lease" under OCSLA's offshore wind leasing provision, *id.* § 1337(p)(7), and shall "notify the Governor of any . . . State" affected by a federal action "which has a direct and significant effect on the outer Continental Shelf or its development," *id.* § 1334(h).

47. Under OCSLA, the Interior Secretary may cancel a lease only after determining, "after a hearing," that:

> (i) continued activity pursuant to such lease . . . would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal or human environment;
>
> (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and
>
> (iii) the advantages of cancellation outweigh the advantages of continuing such lease . . . .

*Id.* § 1334(a)(2)(A).

48. OCSLA provides that a lease cancellation generally "shall not occur unless and until operations under such lease or permit have been under suspension" for a period of five years. *Id.* § 1334(a)(2)(B).

49. OCSLA provides that lease cancellation entitles the lessee to compensation. *Id.* § 1334(a)(2)(C). The lessee may receive "the lesser of":

> (i) the fair value of the canceled rights as of the date of cancellation, taking account of both anticipated revenues from the lease and anticipated costs, including costs of compliance with all applicable regulations and operating orders, liability for cleanup costs or damages, . . . and all other costs reasonably anticipated on the lease, or
>
> (ii) the excess, if any, over the lessee's revenues, from the lease (plus interest . . . ) of all consideration paid for the lease and all direct expenditures made by the lessee after the date of issuance of such lease and in connection with exploration or development, or both, pursuant to the lease.

*Id.*

50. OCSLA also directs the Interior Secretary to prescribe regulations "for the assignment or relinquishment of a lease." *Id.* § 1334(a)(3); *see* 30 C.F.R. § 585.435. A lessee may "surrender a lease . . . by filing with BOEM a properly completed official relinquishment form." 30 C.F.R. § 585.435(a). Relinquishing a lease does not absolve the lessee of the obligation to "[m]ake all payments due on the lease[,] . . . including any accrued rent and deferred bonuses." *Id.* § 585.435(a)(1). OCSLA also does not provide for any compensation, such as repayment of previous lease payments, to a lessee who voluntarily relinquishes a lease. *See id.*

51. BOEM administers the Outer Continental Shelf leasing program pursuant to its renewable energy regulations under OCSLA, contained in 30 C.F.R.

Part 585. BOEM identifies leasing areas, conducts environmental assessments prior to leasing, and then leases the areas out, usually through a competitive bidding process. *Id.* §§ 585.102, .201–.232.

52. Once a lease is sold, a lessee must submit a plan for site assessment activities. *Id.* §§ 585.600, .605–.613. If BOEM approves the site assessment plan, the lessee has five years to conduct site assessment activities to gather necessary data. *Id.* § 585.235(a)(1).

53. BOEM's regulations require BOEM to ensure that activities authorized under its renewable energy regulations are carried out "in a manner that provides for and reaches a rational balance among" the twelve factors enumerated by OCSLA. *Id.* § 585.102(a). The regulations further state that "to the extent [the factors] conflict or are otherwise in tension, none of [the factors] inherently outweighs or supplants any other." *Id.*

## II. The National Environmental Policy Act

54. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Pursuant to that requirement, an agency must take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.

55. To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies may prepare an environmental assessment. *Id.* § 4336(b)(2). If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can

issue a finding of no significant impact. *Id.* If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. *Id.* § 4336(b)(1)–(2). Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id.* § 4332(C)(iii), (F), (H).

**III. The Judgment Fund Act**

56. The Judgment Fund Act created a permanent, indefinite appropriation administered by the Department of the Treasury from which the federal government may pay final judgments, awards, and compromise settlements. 31 U.S.C. § 1304.

57. The Judgment Fund may only be used when: (1) payment is not otherwise provided for, (2) payment is certified by the Secretary of the Treasury, and (3) the judgment, award, or settlement is payable under certain statutory provisions, including, as relevant here, 28 U.S.C. § 2414. 31 U.S.C. § 1304(a). That provision, 28 U.S.C. § 2414, only allows "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States, or against its agencies or officials upon obligations or liabilities of the United States, made by the Attorney General or any person authorized by him."

58. The U.S. Government Accountability Office's *Principles of Federal Appropriations Law*, known as the Red Book, explains that "[l]itigation is not imminent for purposes of this provision merely because a claimant will sue if the agency does not pay. There must be a legitimate dispute over either liability or

amount. Absent such a dispute or impasse, there is nothing to refer to the Attorney General."[6]

59. The Office of Legal Counsel has similarly concluded that a settlement is payable from the Judgment Fund only if the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached."[7]

## IV. The Constitutional and Statutory Framework for Federal Appropriations and Spending

60. The Appropriations Clause of the U.S. Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations Made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause has a "fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

61. The Spending Clause gives Congress the exclusive authority "[t]o lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare to the United States." U.S. Const. art. I, § 8, cl. 1. "Congress has broad power under the Spending Clause . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).

---

[6] 3 Gov't Accountability Off., GAO-08-978SP, Principles of Federal Appropriations Law 14-35 (3d ed. 2008), https://www.gao.gov/assets/2019-11/203470.pdf.

[7] Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. O.L.C. 98, 103 (1989).

62. In effect, Article I of the U.S. Constitution provides Congress with the exclusive power of the purse. *See* The Federalist No. 78 (Alexander Hamilton) (noting that Congress "commands the purse"). This principle is reinforced in numerous federal statutes, including the Antideficiency Act, Purpose Statute, and Miscellaneous Receipts Act.

63. The Antideficiency Act makes it unlawful for "an officer or employee of the United States Government" to "(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;" or "(B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A), (B). The law "is designed to keep governmental agencies operating within the limits of their appropriated funds." *Nat'l Fed'n of Fed. Emps. v. Devine*, 679 F.2d 907, 913 n.11 (D.C. Cir. 1981).

64. The Purpose Statute, a "core tenet of appropriations law," *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012), provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a).

65. And the Miscellaneous Receipts Act dictates that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim" and that "[a] person having custody or possession of public money . . . shall deposit the money without delay in the Treasury." *Id.* § 3302(b)–(c). In other words,

"an agency . . . may not retain for credit to its own appropriations anything Congress has not expressly authorized."[8] *See* Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1364 (1988) ("[T]he Miscellaneous Receipts statute and the Anti-Deficiency Act addressed a chronic problem Congress faced throughout the 19th century: ensuring that executive agencies did not obligate the public fisc except in the amounts appropriated by Congress.").

## FACTUAL ALLEGATIONS

### I. The Federal Government's Consistent Support for Offshore Wind Development from 2005 to 2025

66. Between 2005 and 2025, the federal government consistently supported the development of offshore wind energy. This consistency provided regulatory certainty to offshore wind developers and to the States served by offshore wind projects.

67. In 2005, President George W. Bush signed the Energy Policy Act, which amended OCSLA to allow energy generation on the Outer Continental Shelf from "sources other than oil or gas," such as offshore wind energy. Energy Policy Act of 2005, § 388, 119 Stat. at 744–45. The following year, the Bush Administration opposed a legislative proposal that would have singled out offshore wind projects by subjecting them to additional review.[9]

---

[8] 3 Gov't Accountability Off., *supra* note 6, at 12-125.

[9] NGI Staff Reps., *Bush Administration Opposes Measure Threatening to Cape Wind*, Nat. Gas Intel. (May 8, 2006, at 12:00 AM), https://naturalgasintel.com/news/bush-administration-opposes-measure-threatening-to-cape-wind/.

68. From 2015 to 2016, the Obama Administration oversaw the successful construction of the country's first offshore wind project, the Block Island Wind Farm, off the coast of New York and Rhode Island.

69. From 2017 to 2021, the first Trump Administration supervised an expansion of the country's offshore wind program, conducting competitive lease sales for offshore wind development[10] and environmental reviews for the construction and operation of offshore wind projects.[11]

70. In 2020, President Trump signed legislation that created the Wind Energy Technology Program in the U.S. Department of Energy, to "conduct research, development, demonstration, and commercialization of wind energy technologies," including offshore wind-specific technologies such as floating offshore wind platforms. *See* Energy Act of 2020, Pub. L. No. 116-260, Div. Z, 134 Stat. 1182, 2498–501 (codified at 42 U.S.C. § 16237(b)(1)(A), (2)(B)(iv)). The act appropriated $125 million for fiscal years 2021 through 2025 to carry out the Wind Energy Technology Program. 134 Stat. at 2504.

[10] *See, e.g.*, Press Release, Interior, Bidding Bonanza! Trump Administration Smashes Record for Offshore Wind Auction with $405 Million in Winning Bids (Dec. 14, 2018, edited Sep. 29, 2021), https://perma.cc/Z54P-XWUN.

[11] *See, e.g.*, Notice of Availability of a Draft Environmental Impact Statement for Vineyard Wind LLC's Proposed Wind Energy Facility Offshore Massachusetts, 83 Fed. Reg. 63184 (Dec. 7, 2018).

71. In 2021, the Biden Administration set a goal of deploying 30 gigawatts of offshore wind by 2030, enough to power 10 million homes.[12]

72. From 2021 to 2025, Interior, BOEM, and other federal agencies continued to conduct competitive lease sales for, and environmental reviews of, offshore wind projects.[13] During that time, Congress also passed laws directing additional funds and tax credits toward offshore wind development. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 41007(b)(1), 135 Stat. 429, 1129 (2021) (appropriating $60 million to carry out the Wind Energy Technology Program); Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 13052(a), 136 Stat. 1818, 1971–81 (creating the advanced manufacturing production tax credit to support domestic manufacturing of offshore wind components).

## II. The States' Efforts to Develop Offshore Wind

73. Against this backdrop of consistent federal support for offshore wind and consistent application of federal laws and regulations by the federal agencies administering the country's offshore wind program, the States made plans to facilitate the development of offshore wind projects and to purchase power from those projects.

[12] Press Release, U.S. Dep't of Energy, Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind Deployment Target by 2030 (Mar. 29, 2021), https://perma.cc/MHG5-E9P4.

[13] *See, e.g.*, Press Release, Interior, Biden-Harris Administration Marks Major Milestones for Offshore Wind, Approves Tenth Project (Sep. 5, 2024), https://perma.cc/J5ZW-U9QA.

74. In 2018, the New York Public Service Commission adopted the Offshore Wind Standard. In doing so, the Public Service Commission recognized that offshore wind:

> is projected to provide numerous benefits in addition to . . . reducing greenhouse gas emissions. Because of its proximity and direct access to load centers, offshore wind would provide substantial reliability and diversity benefits to the electric system. Offshore wind also has the potential to create thousands of jobs for New Yorkers, both in construction of the facilities and in the operations and maintenance of the completed projects. It may also produce significant public health benefits by displacing fossil-fired generation in the downstate area.[14]

75. The Offshore Wind Standard requires utilities and other load-serving entities (entities that provide electricity to customers) to procure offshore wind RECs, which represent the environmental attributes associated with renewable energy generated by offshore wind.

76. In July 2019, the New York State Legislature passed the Climate Leadership and Community Protection Act (the Climate Act), which requires the development of 9 gigawatts of offshore wind energy by 2035. Climate Act, 2019 N.Y. Laws ch. 106, § 4(5); N.Y. Pub. Serv. Law § 66-p(5). The Climate Act also sets broader greenhouse gas emission-reduction targets of 40% from 1990 levels by 2030 and 85% from 1990 levels by 2050. Climate Act §§ 1–2; N.Y. Env't Conserv. Law § 75-0107. It calls for New York's electricity sector to be 100% free of greenhouse gas emissions by

[14] Order Establishing Offshore Wind Standard and Framework for Phase 1 Procurement at 3, *In re Offshore Wind Energy*, No. 18-E-0071 (N.Y. Pub. Serv. Comm'n July 12, 2018), NYSDPS-DMM Item No. 49.

2040, with 70% of that electricity generated by renewable energy sources. Climate Act § 1(12)(d); N.Y. Pub. Serv. Law § 66-p(2).

77. The New York State Energy Research and Development Authority (NYSERDA), a public benefit corporation and public authority incorporated under Title 9 of the New York State Public Authorities Law, administers New York's Offshore Wind Standard pursuant to orders issued by the New York Public Service Commission and in furtherance of the goals of the Climate Act. As administrator of this program, NYSERDA administrates offshore wind solicitations, which seek proposals from offshore wind developers to deliver offshore wind energy to New York. The competitively selected projects enter into contracts to sell RECs to NYSERDA, which then sells the certificates to utilities and other load-serving entities to comply with the Offshore Wind Standard.

78. Likewise, New Jersey, with its extensive coastline, has taken steps to facilitate offshore wind development. In 2010, the New Jersey Legislature enacted the Offshore Wind Economic Development Act, which authorized the New Jersey Board of Public Utilities (NJBPU) to conduct solicitations for offshore wind projects to receive offshore wind RECs in exchange for providing electricity to the New Jersey electric grid. The goal of these solicitations was to enable a percentage of New Jersey's electric load to be supplied by offshore wind energy. In 2018, New Jersey's initial statutory requirement of 1.1 gigawatts of offshore wind energy was increased to 3.5 gigawatts. 2018 N.J. Laws ch. 17, § 2; N.J. Stat. Ann. § 48:3-87(d)(4).

79. New Jersey has further promoted the development of offshore wind by adopting legislation to reduce greenhouse gas emission reductions. For instance, New Jersey passed the Global Warming Response Act, which requires the State to achieve an 80% reduction from 2006 greenhouse gas emissions by 2050. 2007 N.J. Laws ch. 112, § 2; N.J. Stat. Ann. § 26:2C-38. As the power generation sector is the sector that emits the second-largest volume of greenhouse gases, reducing those emissions is key to achieving these goals.

80. By 2022, through a series of executive orders, statutory enactments, and policy planning documents, New Jersey's offshore wind-generation goal increased from 7.5 gigawatts by 2035 to 11 gigawatts by 2040, and the State accelerated the timeline for reaching its goal of 100% clean energy from 2050 to 2035. N.J. Exec. Order No. 307 (Sep. 21, 2022); N.J. Exec. Order No. 315 (Feb. 15, 2023).

81. The New England States and Delaware have also adopted policies to encourage renewable energy development, including offshore wind development, which are discussed in more detail at ¶¶ 167-88.

## III. BOEM's Decision to Award the Lease to Bluepoint and Bluepoint's Plans to Develop the Lease Area

82. In October 2017, New York sent BOEM a document identifying an "area for consideration for the potential locating of offshore wind energy areas."[15] The area

[15] Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight—Call for Information and Nominations, 83 Fed. Reg. 15602, 15603–04 (Apr. 11, 2018).

was located in the New York Bight, a large, shallow section of ocean between Long Island and the New Jersey coast.

83. The following spring, BOEM published a call for information and nominations, in which it requested public comment about potential commercial wind leasing opportunities in the New York Bight. After receiving responses to its call for information, BOEM began the process of identifying "wind energy areas," the areas of the New York Bight most suitable for leasing.

84. As part of its identification process, BOEM coordinated with DOD to assess the potential wind energy areas' compatibility with national security. DOD identified portions of the New York Bight as "wind exclusion" areas due to the potential conflict of wind turbines with military exercise areas and with weather radar, depending on the height of the turbines.

85. In response, BOEM withdrew some of its recommended wind energy areas from consideration and promised to work with the U.S. Air Force to ensure that any future development adopted appropriate mitigation measures. BOEM also announced its intent to continue working with DOD to ensure that any wind energy projects selected for construction would adopt mitigation measures to avoid potential impacts to the North American Aerospace Defense Command's air surveillance radar.

86. In early 2021, after more than three years of review and stakeholder engagement, BOEM identified almost 800,000 acres in the New York Bight as suitable for wind energy development. A few months later, BOEM proposed to offer eight New York Bight lease areas for sale in a competitive auction.

87. BOEM subsequently conducted an environmental analysis that assessed the potential impacts of the issuance of the proposed leases, including the environmental consequences associated with site characterization and assessment. In January 2022, BOEM published a final sale notice in which it described its plan to auction off six offshore leases in the New York Bight.

88. BOEM held the auction in February 2022. The auction drew winning bids from six developers that totaled around $4.37 billion, making it the country's highest-grossing competitive offshore energy lease sale in history.

89. Bluepoint bid $765 million and won lease number OCS-A 0537, a lease area of over 71,000 acres located around 38 nautical miles off the New York coast and 53 nautical miles off the New Jersey coast. Bluepoint's Lease area is depicted in brown and marked with an "x" at the eastern edge of the map below:




90. In April 2022, OW Ocean Winds East, LLC, entered into a Lease agreement with BOEM. Soon after, the company changed its name to Bluepoint.

91. In March 2023, Bluepoint sent BOEM a letter stating that it would not conduct site assessment activities and would instead develop the Lease area based on existing data.

92. In October 2024, BOEM issued a final programmatic environmental impact statement analyzing the potential impact of wind energy development in the six lease areas in the New York Bight. BOEM recognized the importance to New York

and New Jersey of developing the lease areas in the New York Bight, stating that it "would assist with meeting several state mandates for renewable energy" and referencing New York's goal of procuring 9 gigawatts of offshore wind energy by 2035 and New Jersey's goal of procuring 11 gigawatts of offshore wind energy by 2040.[16]

93. Two months later, BOEM issued a record of decision identifying the avoidance, minimization, mitigation, and monitoring measures that BOEM would apply as conditions of approval of the six developers' construction and operations plans. The record of decision specifies that the developers must coordinate with certain radar operators, including DOD's Military Aviation and Installation Assurance Siting Clearinghouse, to assess whether any of the offshore wind projects could impermissibly interfere with radar, and if so, to institute mitigation measures.

94. In January 2025, Bluepoint and BOEM entered into an amended Lease agreement. The amended agreement provides that "[a]ny cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities."[17] The amended agreement also affirms that "[a]ny cancellations are subject to the limitations and

[16] 1 BOEM, BOEM 2024-051, New York Bight Final Programmatic Environmental Impact Statement at ES-4 (Oct. 2024), https://perma.cc/626Q-UH65.

[17] Amendment and Restatement of Renewable Energy Lease Agreement OCS-A 0537 Between the United States and Bluepoint Wind, LLC § 8 (fully executed Jan. 16, 2025).

protections contained in subsections 5(a)(2)(B) and (C) of [OCSLA] (43 U.S.C. § 1334(a)(2)(B) and (C)).”[18]

95. As recently as November 2025, Bluepoint stated publicly that it “intends to develop a state-of-the-art offshore wind power project within the Lease Area.”[19]

## IV. The Trump Administration’s Unlawful Attempts to Hinder the Development of Wind Energy

96. President Trump’s inauguration to a second term in January 2025 abruptly reversed two decades of consistent support for the country’s offshore wind program. Moreover, the second Trump Administration’s illegal actions to hinder offshore wind development shattered the regulatory certainty that federal agencies had fostered across multiple presidential administrations through consistent application of federal laws and regulations in reviewing and permitting these projects.

97. These efforts have repeatedly been found unlawful and enjoined by federal courts.

98. On January 20, 2025, President Trump issued a memorandum that withdrew all areas of the Outer Continental Shelf from consideration for wind energy leasing and halted all federal approvals necessary for the development of offshore and onshore wind energy (the Wind Memo). Pursuant to the Wind Memo, several federal agencies immediately stopped issuing any wind energy authorizations.

---

[18] *Id.*

[19] Bluepoint Wind, Semi-Annual Progress Report 1 (Nov. 1, 2025), https://perma.cc/7A9R-6VAT.

99. On December 8, 2025, the U.S. District Court for the District of Massachusetts issued a memorandum and order declaring that the pause "constitutes a final agency action that is arbitrary and capricious and contrary to law" and vacating it. *New York v. Trump*, 811 F. Supp. 3d 215, 226 (D. Mass. 2025). The federal government ultimately did not pursue an appeal of that decision.

100. The same day the Wind Memo was issued, President Trump also declared a "National Energy Emergency" (the Energy Emergency Memo), asserting that there was "insufficient energy production" in the United States and directing agencies to expedite and facilitate "energy" development.[20] The Energy Emergency Memo defined "energy" to exclude wind and solar facilities.

101. In response to the Energy Emergency Memo, in April 2025, Interior announced that it would "implement emergency permitting procedures to accelerate the development of domestic energy resources," excluding wind and solar facilities.[21] As part of these procedures, Interior "will be adopting an alternative National Environmental Policy Act compliance process to allow for more concise documents and a compressed timeline. Projects requiring a full environmental impact statement, typically a two-year process, will be reviewed in roughly 28 days."[22]

[20] Exec. Order No. 14156, 90 Fed. Reg. 8433, 8434 (Jan. 29, 2025).

[21] Press Release, Interior, Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply (Apr. 23, 2025), https://perma.cc/SY6T-YTGS.

[22] *Id.*

102. Also in April 2025, BOEM issued an order requiring Empire Wind, a wind farm under construction in the New York Bight, to "halt all ongoing activities related to the Empire Wind Project on the outer continental shelf to allow time for [BOEM] to address feedback it has received, including from the National Oceanic and Atmospheric Administration (NOAA), about the environmental analyses for that project."[23] BOEM described this order as an "outgrowth" of the review that Interior was undertaking pursuant to President Trump's Wind Memo. The following month, BOEM lifted the order without explanation.

103. In July 2025, President Trump issued another executive order targeting wind energy, this time directing the Interior Secretary to eliminate all sources of "preferential treatment" for wind and solar energy.[24] The executive order characterized wind energy as "expensive and unreliable," as "denigrat[ing] the beauty of our Nation's natural landscape," and as "threaten[ing] national security by making the United States dependent on supply chains controlled by foreign adversaries."[25]

104. In August 2025, BOEM issued another order, now directing a halt to work on Revolution Wind, a wind farm under construction off the coast of Rhode Island. BOEM stated that this order was the result of a national security review undertaken pursuant to President Trump's Wind Memo. The project developer sought judicial review of the order, and a few weeks later, the U.S. District Court for

[23] BOEM, Acting Director's Order to Halt All Ongoing Activities Issued to Empire Offshore Wind LLC (Apr. 16, 2025), https:///perma.cc/X8UY-QJ3Q.

[24] Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 10, 2025).

[25] *Id.* § 1.

the District of Columbia granted the developer's motion for a preliminary injunction, finding that the developer had demonstrated a likelihood of success on the merits. Specifically, the court explained that BOEM's order represented "a clear change in position on the part of [BOEM], which previously certified that the [Revolution Wind] project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process," and that BOEM "did not make any factual findings or cite any reasons to believe that [] Revolution Wind was no longer in compliance with [OCSLA]." Tr. of Prelim. Inj. Hr'g at 41:1–5, :13–16, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sep. 26, 2025), ECF No. 39.

105. On December 22, 2025, Acting Director Giacona issued orders directing five offshore wind projects, including Empire Wind and Revolution Wind, to "suspend all ongoing activities related to the [projects] on the Outer Continental Shelf for the next 90 days for reasons of national security."[26] These single-page suspension orders were purportedly based on "national security threats" identified in a November 2025 classified assessment conducted by DOD. The suspension orders stated that BOEM could "further extend the 90-day suspension" pending its discussions with DOD.[27]

106. Between January and February 2026, federal district courts stayed or preliminarily enjoined all five suspension orders based on determinations that the classified assessment, which the courts reviewed *in camera*, did not identify the immediate national security risk asserted by BOEM. Prelim. Inj., *Revolution Wind*

[26] BOEM, Acting Director's Orders to Suspend All Ongoing Activities, *supra* note 5.
[27] *Id.*

(Jan. 12, 2026), ECF No. 63; Min. Order, *Empire Leaseholder LLC v. Burgum*, No. 26-cv-04 (D.D.C. Jan. 14, 2026); Order, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 25-cv-830 (E.D. Va. Jan. 16, 2026), ECF No. 81; Elec. Order, *Vineyard Wind 1 LLC v. U.S. Dep't of the Interior*, No. 26-cv-10156 (D. Mass. Jan. 27, 2026), ECF No. 71; Min. Order, *Sunrise Wind LLC v. Burgum*, No. 26-cv-28 (D.D.C. Feb. 2, 2026).

107. In April 2026, a federal district court preliminarily enjoined various federal agencies, including Interior and BOEM, from enforcing several actions designed to inhibit the development of wind and solar energy, including a July 2025 Interior memo that mandated additional review procedures for wind and solar energy projects and an August 2025 order by Interior Secretary Burgum directing Interior to consider a proposed energy project's "capacity density" when reviewing project applications, a metric that was designed to disadvantage wind and solar energy. *RENEW Ne. v. U.S. Dep't of the Interior*, No. 25-cv-13961, 2026 WL 1078282 at *1 (D. Mass. Apr. 21, 2026), *appeal docketed*, No. 26-1731 (1st Cir. June 24, 2026). The court found that each of the challenged actions was likely arbitrary and capricious or contrary to law.

108. The Trump Administration's actions reflect a concerted effort to hinder the development of wind energy, an industry that is critically important to the States.

109. Those actions are consistent with statements by Interior Secretary Burgum and President Trump vociferously opposing wind energy.

110. Interior Secretary Burgum has described offshore wind energy as "a scam"[28] and "one of the most expensive, unreliable, subsidy-dependent schemes ever pushed upon American taxpayers."[29] He has also stated that, "[u]nder this administration, there is not a future for offshore wind because it is too expensive and not reliable enough."[30]

111. President Trump, meanwhile, has called wind "the worst" and "most expensive form of energy" and has stated that offshore wind projects "kill your birds" and "ruin your beautiful landscapes."[31] Earlier this year, he announced that "my goal is not to build any windmills in this country."[32] President Trump recently told Interior Secretary Burgum that "I can proudly say, Doug, that we have not approved one windmill since I've been in office. And we're going to keep it that way. My goal is to not let any windmill be built."[33]

[28] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, at 2:04 PM), https://perma.cc/X6RE-E3WQ.

[29] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 3:23 PM), https://perma.cc/55JT-MKJT.

[30] Kimball, *supra* note 4.

[31] Helena Horton, *Tilting at Windmills? Trump's Claims About Turbines Fact-Checked*, The Guardian (July 28, 2025, at 8:21 AM), https://perma.cc/97Z7-YMDZ; Reuters, *Trump Orders Suspension of New Offshore Wind Power Leasing* (Jan. 21, 2025, at 11:03 AM), https://perma.cc/KCH9-98FZ.

[32] Aaron Rupar (@atrupar), X (Jan. 9, 2026, at 4:10 PM), https://perma.cc/CAX7-M2T5.

[33] Keith, *supra* note 3.

## V. Federal Defendants Take Money from the Judgment Fund to Pay Offshore Wind Developers to Abandon Their Leases

### A. The TotalEnergies Settlement Agreements

112. Despite these repeated losses in court, Federal Defendants have now devised a new strategy to suppress the growth of the offshore wind industry: paying developers to walk away from their leases.

113. In March 2026, Interior announced that it had reached an agreement with TotalEnergies to cancel its wind leases off the coast of New York and North Carolina. The press release explained that, in exchange for the cancellation of its two leases, TotalEnergies would be reimbursed $928 million from the U.S. government and would spend an equivalent amount on the construction of a liquefied natural gas plant and the development of upstream conventional oil and shale gas production.

114. Federal Defendants later published the settlement agreements. According to the agreements, DOD had raised classified national security concerns that would have caused Federal Defendants to indefinitely suspend construction on the TotalEnergies leases, and TotalEnergies would have sued. To settle this hypothetical suit, Federal Defendants would reimburse TotalEnergies $928 million and cancel the leases in exchange for TotalEnergies agreeing to invest $928 million in oil and gas development and covenanting not to sue.

115. The recitations in the TotalEnergies settlement agreements do not reflect the actual chronology of events and do not show that litigation was imminent, as required to use the Judgment Fund.

116. The parties to the settlement agreements were effectively on the same side. TotalEnergies first approached Interior to propose that Interior cancel its leases so that TotalEnergies could receive a refund. Indeed, TotalEnergies' chief executive officer asserted that that settlement agreements "came from us—we took the initiative."[34]

117. Notably, although the TotalEnergies settlement agreements assert that, had Interior Defendants not reached settlements with TotalEnergies, BOEM "would have issued" suspension orders "due to national security concerns, similar to" BOEM's five December 2025 suspension orders, documents obtained through Freedom of Information Act requests reveal that Interior and BOEM were in fact working on a "memorandum of understanding" with TotalEnergies as early as November 16, 2025, before BOEM Acting Director Giacona first reviewed the classified information that purportedly motivated the suspension orders, Decl. of Matthew Giacona ¶ 6, *Sunrise Wind* (Jan. 23, 2026), ECF No. 31-1 (declaration from Acting Director Giacona affirming that he first reviewed the classified information on November 26, 2025).

118. Moreover, the settlement agreements do not discuss a referral to the Attorney General or evince any substantive involvement by DOJ, which is responsible for negotiating any settlement that requires a payment from the Judgment Fund. *See* 30 C.F.R. § 256.1. Nor do any DOJ personnel appear on Interior emails from

---

[34] Amy Harder, *TotalEnergies CEO on Controversial Offshore Wind Deal: "It's Our Money"*, Axios (Apr. 17, 2026), https://www.axios.com/2026/04/17/totalenergiestrump-offshore-wind-deal.

November and December 2025 containing draft "contract[s] of mutual recission" and "memorand[a] of understanding" between Interior and TotalEnergies.

**B. The Bluepoint Settlement Agreement**

119. On April 27, 2026, Interior issued a press release announcing that it had reached "two additional separate agreements to promote U.S. Energy security and affordability following the model of its recent deal with TotalEnergies."[35] According to the press release, Bluepoint and another offshore wind developer based in California:

> have each separately agreed to voluntarily end their offshore wind leases, with the respective affiliate companies agreeing to make financial investments in reliable conventional energy projects.
>
> These historic agreements provide dollar-for-dollar reimbursement for offshore wind leases that have been impractical to develop without relying on taxpayer subsidies. By cancelling these leases and promoting investments away from intermittent, higher-cost energy sources toward proven conventional solutions, these agreements support mutually beneficial investments that will now generate returns for American taxpayers. Additionally, these investments advance President Donald J. Trump's Energy Dominance Agenda to leverage the nation's natural resources to benefit American citizens and help lower everyday energy costs.[36]

120. The press release explained that, in exchange for the cancellation of the Lease, Bluepoint would be reimbursed $765 million from the U.S. government and would spend an equivalent amount on the development of a liquefied natural gas

---

[35] Press Release, Interior, Interior Announces Two Historic Agreements to Promote Affordable, Reliable Energy Production in the United States (Apr. 27, 2026), https://perma.cc/WLT9-7H3U.

[36] *Id.*

facility. The press release also stated that, "Bluepoint Wind has decided not to pursue any new offshore wind developments in the United States."[37]

121. Interior and Bluepoint executed the Settlement Agreement on April 27, 2026, the same day as Interior issued the press release.

122. The Settlement Agreement states that DOD "raised classified national security concerns about development of this lease that were not known to BOEM at the time of lease issuance and that would have prevented the lease issuance if they had been considered." Ex. 1, Settlement Agreement Between the United States and Bluepoint Wind, LLC Re: Lease No. OCS-A 0537 (Settlement Agreement) at 2 (Apr. 27, 2026). "[I]f this offshore wind project would have continued," the Settlement Agreement reads, "BOEM would have issued to Bluepoint an order to suspend construction and operations of this project indefinitely due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." *Id.* According to the Settlement Agreement:

> Bluepoint has asserted that BOEM's discontinuation of action with respect to [Bluepoint's] Construction and Operations Plan and other actions are in breach of or seriously impair the value of Lease No. OCS-A 0537, and that a suspension order would constitute a further breach or impairment of its rights under Lease No. OCS-A 0537, and that Bluepoint accordingly intends to immediately commence claims against the United States in the United States Court of Federal Claims asserting claims for breach of contract and/or uncompensated takings under the Fifth Amendment of the United States Constitution. *Id.*

123. The Settlement Agreement requires Bluepoint to spend $765 million—the price it paid for the Lease—on "eligible expenditures" directed toward

[37] *Id.*

"conventional energy projects," i.e., fossil fuel-based energy projects. *Id.* at 4. The Settlement Agreement allows Bluepoint to apply past expenditures made since December 18, 2025, toward the $765 million. Once Bluepoint had made and accounted for those expenditures, the Settlement Agreement states, Interior will cancel the Lease and "submit a request for payment . . . to the Judgment Fund Branch at the United States Department of the Treasury's Bureau of the Fiscal Service." *Id.* at 5–6.

124. The recitations in the Settlement Agreement do not reflect the actual chronology of events and do not show that litigation was imminent, as required to use the Judgment Fund.

125. Rather, as shown by documents obtained through Freedom of Information Act requests, Bluepoint first articulated a legal justification for the reimbursement of the Lease price in February 2026, over a month after Bluepoint met with Federal Defendants to discuss cancelling the Lease.

**C. Other Settlement Agreements**

126. On June 17, 2026, Interior announced that it had reached new, nearly identical agreements with four Invenergy affiliates that held offshore wind leases in the New York Bight and the Gulf of Maine and off California's Central Coast. Two days later, Interior announced another lease cancellation and settlement agreement, this time for Duke Energy's former lease in the Carolina Long Bay, and in early August 2026, RWE U.S. Offshore announced that Interior would pay it $1.22 billion to cancel three leases off the coast of New York, California, and Louisiana.

127. In total, as of September 22, 2026, Federal Defendants have unlawfully agreed to pay more than $4 billion of taxpayer money from the Judgment Fund in the middle of an energy affordability crisis to advance the President's policy objective of suppressing the growth of the country's offshore wind industry.

## VI. The States' Harms

128. The Settlement Agreement and Lease cancellation have significant impacts on and cause harm to the States.

### A. New York Is Harmed by the Lease Cancellation and Settlement Agreement

129. The Lease cancellation and the Settlement Agreement that precipitated it harm New York's energy, economic, and environmental and public health interests. Further, New York has significant reliance interests in the Lease. As discussed below, New York has relied on the development of the Lease area as a component of its strategy to support grid reliability and energy diversification, economic growth, climate goals, and environmental and public health. In cancelling the Lease, Interior Defendants did not acknowledge these reliance interests.

#### *1. New York's Energy Interests*

130. The Lease cancellation and Settlement Agreement will harm New York's energy interests by depriving New York of a planned source of offshore wind energy that would have been sufficient to serve around 1.5 million homes in New York City and the surrounding area.

131. Offshore wind energy is critical to meeting New York's growing need for reliable, affordable, and clean energy. According to analysis performed for the 2025

New York State Energy Plan, future electricity demand is projected to grow and will require investments in the expansion of the electric system, including the development of new offshore wind projects.

132. Maintaining the reliability of New York's electric system will require substantial deployment of new energy resources, such as offshore wind, alongside modernization of essential transmission and distribution infrastructure. According to the 2025 State Energy Plan, economic development and the operation of data centers is expected to cause substantial increases in electricity demand—8% above 2025 levels by 2030 alone, with demand rising to 24% above 2025 levels by 2040 and 42% above 2025 levels by 2050.

133. At the same time, New York's Independent System Operator (NYISO) reports that by 2028, 6.5 gigawatts of fossil fuel generation in New York will reach an age beyond which 95% of similarly aged U.S. generators are expected to retire. Aging generators pose reliability risks even when they are extended, meaning that investment to backfill these resources is essential for long-term reliability.

134. Consistent with those findings, NYISO, in its October 2025 Q3 Short-Term Assessment of Reliability (STAR) Report, identified a need for additional electricity generation, demand-side solutions, and/or transmission solutions to ensure electric system reliability in New York City as early as summer 2026. NYISO's 2026 Q1 STAR Report, issued in April 2026, confirms a continuing reliability need.

135. Each offshore wind lease in the New York Bight constitutes an important component of New York's efforts to secure enough offshore wind energy to

meet demand, and the loss of any lease makes it less likely that New York will achieve its energy goals.

136. Wind energy facilities built on the Lease area were anticipated to interconnect directly into New York's Load Zone J, the load zone for New York City.

137. Those wind energy facilities would provide critical energy diversity benefits (benefits from having diverse sources of electricity) to New York City. A recent analysis commissioned by NYISO found that the availability of a large quantity of offshore wind energy transmitted directly into New York City would enhance grid reliability in cold weather by reducing dependency on oil and gas.

138. The Lease cancellation, combined with other nearby lease cancellations, will severely reduce available energy production in the New York Bight.

139. The Bluepoint project could have generated 2.4 gigawatts of clean wind energy, enough to power around 1.5 million homes. Together, the canceled Bluepoint, TotalEnergies, Invenergy, and RWE wind projects in the New York Bight could have added approximately 11.1 gigawatts of generating capacity to serve the New York downstate load.

140. The settlement agreements that facilitated these lease cancellations also serve as a blueprint for other offshore wind leaseholders to receive compensation for the cancellation of their leases, an appealing prospect for project developers that have obligations to shareholders and that are unable to make progress on projects due to the Trump Administration's opposition to wind energy. If other leaseholders make similar deals with Interior, the amount of energy production available in the

New York Bight may be reduced by as much as 80%, further eroding New York's ability to rely on offshore wind resources as part of its planning for a reliable and diverse energy portfolio.

141. The importance of each offshore wind lease in the New York Bight is magnified by the unlawful cancellation of other offshore wind leases and the publication of the Wind Memo on January 21, 2025, which made all areas of the Outer Continental Shelf that were not leased as of that date unavailable for future wind energy leasing. The lease cancellations and Wind Memo drastically limit the locations available for offshore wind projects.

142. New York's efforts to diversify its energy supply and enhance grid resilience and capacity in order to support downstate electric load growth while also meeting its climate goals, including the procurement of 5 to 7 gigawatts of offshore wind energy by 2040, will be compromised if the Lease cancellation is not set aside.

*2. New York's Economic Interests*

143. The Settlement Agreement and Lease cancellation will also inflict economic harms on New York.

144. Extrapolating from Empire Wind and Sunrise Wind, the two offshore projects under construction off the coast of New York, the Bluepoint project could have delivered hundreds of millions of dollars in economic benefits to New York over its lifetime. These anticipated economic benefits include inducing $8.3 billion in in-State investment. Further, the project was expected to generate substantial tax revenue and to create 1,400 new in-State jobs.

145. The Lease cancellation will deprive New York of the economic benefits that would have resulted from development of the Lease area by Bluepoint or another offshore wind developer. Further, the Lease cancellation will chill investment in and development of offshore wind energy in New York, cutting off a significant new source of economic benefits to the State. These economic benefits include jobs, investments in electrical infrastructure, substantial tax revenues, and payments in lieu of taxes.

146. Further, NYSERDA has expended substantial resources to promote the development of offshore wind energy in the New York Bight. As a result of the Lease cancellation, NYSERDA will need to redirect additional resources to analyze the impact of the cancellation and to determine whether the clean energy that would have come from Bluepoint's development of the Lease can be replaced.

147. Any such replacement, if one exists, will likely be more costly, as most of the remaining lease areas in the New York Bight are farther from New York City, and the farther a wind energy project is from its interconnection point, the more expensive and challenging it is to permit, construct, and maintain.

148. The Lease cancellation will also impose market harms on New York, likely making it more expensive for New York to procure offshore wind energy in the future. NYSERDA solicits proposals from offshore wind developers through competitive solicitations, a process that allows NYSERDA to secure contracts with offshore wind developers at lower cost than it would through noncompetitive awards.

149. Because so few leases currently exist in the New York Bight, the loss of any one lease—here, the Bluepoint Lease—increases the chance that NYSERDA's

future offshore wind solicitations will not be as competitive, likely increasing the price New York must pay to procure offshore wind energy.

#### *3. New York's Climate Goals and Environmental and Public Health Interests*

150. Finally, the Settlement Agreement and Lease cancellation will adversely affect New York's ability to mitigate climate change and the health effects of fossil fuel-based energy.

151. The New York State Legislature enacted the Climate Act in July 2019. The Climate Act, as amended, sets greenhouse gas-reduction targets of 40% from 1990 levels by 2030 and 85% from 1990 levels by 2050. Climate Act §§ 1–2; N.Y. Env't Conserv. Law § 75-0107. It calls for New York to have a 100% emissions-free electricity sector by 2040 and to be powered by 70% renewable energy. Climate Act § 1(12)(d); N.Y. Pub. Serv. Law § 66-p(2). The Climate Act also targets the development of 9 gigawatts of offshore wind energy by 2035. Climate Act § 4(5); N.Y. Pub. Serv. Law § 66-p(5).

152. Offshore wind projects are expected to play a significant role as New York pursues a zero-greenhouse gas emissions electric system pursuant to the Climate Act. The core planning scenario of New York's 2025 State Energy Plan includes 5 to 7 gigawatts of offshore wind being added to New York's electric system by 2040.

153. Completion and operation of the Bluepoint project could have led to the avoidance of 6.6 million metric tons of carbon dioxide emissions.

154. The Lease cancellation will therefore impede New York's ability to fulfill its statutory and energy planning goals, thereby injuring its ability to implement its own laws. It also risks forcing New York to incur additional expenses to meet its emission-reduction and renewable energy targets.

155. The Lease cancellation will also have significant adverse environmental and public health consequences for New York.

156. Notably, the vast majority of electricity in New York City comes from fossil fuel-fired power plants. It is anticipated that incorporating electricity generated from offshore wind in the locations where gas turbines are now used to meet energy demand—for example, in the New York City metropolitan ozone nonattainment area—will reduce emissions and improve air quality for New Yorkers. By reducing the need for electricity generation from combustion turbines, the development of the Lease was anticipated to reduce emissions of fine particulate matter, nitrogen oxides, volatile organic compounds, and other hazardous air pollutants.

157. By reducing emissions from fossil fuels, the Bluepoint project would have reduced harmful emissions and generated large health benefits.

158. The Lease cancellation will delay reductions in greenhouse gas emissions and air quality improvements by stalling the transition from fossil fuel-based energy to energy derived from renewable sources, including offshore wind.

### B. New Jersey Is Harmed by the Lease Cancellation and Settlement Agreement

159. The Lease cancellation and Settlement Agreement will harm New Jersey's energy interests by depriving the State of a potential new source of electricity

to help meet increased capacity demands within the regional electric grid operated by PJM Interconnection, LLC (PJM). Scarcity and congestion issues on New Jersey's electric grid will worsen without energy from offshore wind, including projects like Bluepoint, leading to higher electricity costs for the State and its residents.

160. PJM, which administers the electric grid in Delaware and New Jersey, imports electricity from New York to meet growing power demand in the region. Wind energy generated in the New York Bight Lease could have benefited New Jersey directly, if the project had delivered electricity to New Jersey or another PJM state, or via PJM's import of electricity from NYISO, if the project had delivered energy to New York.

161. New Jersey's energy resource planning, including the 2019 and 2024 Energy Master Plans and the 2020 Offshore Wind Strategic Plan, has included setting goals and targets for offshore wind as part of the State's comprehensive framework to meet projected demand for electricity. As a new, clean energy resource in the New York Bight, Bluepoint was positioned to help the State effectuate those goals and targets.

162. The need for additional electricity supply from offshore wind is critical because PJM's forward-looking planning studies already envision a worsening ratio of supply relative to demand—even when accounting for 11 gigawatts of offshore wind in New Jersey beginning in the early 2030s. Demand for electricity is currently outpacing supply on the regional grid as rapid load growth outpaces the addition of new generation.

163. New Jersey's plan of adding 11 gigawatts of offshore wind energy by 2040 would ease this problem by increasing available supply. Delay or loss of that generation would exacerbate the forecasted electricity supply problem.

164. The northeast portion of the PJM grid, in which New Jersey is located, also suffers from rising annual congestion costs. For example, from 2021 to 2022, congestion costs rose from $995 million to $2.5 billion. When the transmission system is congested, the most efficient source of electricity is not used, and the area with remaining electricity demand is served by alternative, less efficient, more expensive energy sources.

165. New Jersey's planned development of offshore wind generation and transmission would ease congestion and reduce costs, ultimately passing savings on to ratepayers, including New Jersey and its residents. New Jersey's offshore wind generation would complement the west-to-east supply of electricity, while also serving as an alternative source of electricity that would increase reliability and resilience for the PJM grid.

166. In addition, because so few leases currently exist in the New York Bight, the loss of any one lease—here, the Bluepoint Lease—increases the chance that NJBPU's future offshore wind solicitations will not be as competitive, increasing the price New Jersey must pay to procure offshore wind energy.

### C. The New England States and Delaware Are Harmed by the Lease Cancellation and Settlement Agreement

167. Cancellation of offshore wind leases, including the Bluepoint Lease, will also delay or altogether deprive the New England States and Delaware of important

reliability, affordability, clean energy, climate, and emission-reduction benefits. If the Lease cancellation is vacated, the Lease area can proceed toward development and provision of these important benefits to the States and their residents.

168. Similar to New York and New Jersey, energy demand in the New England States and Delaware is projected to rise over the next ten years. Offshore wind energy, including energy generated in the New York Bight, is critical to meeting this demand and maintaining a reliable grid.

169. The New England States and Delaware participate in regional high-voltage electric grids and wholesale markets for electricity administered by the non-profits Independent System Operator New England (ISO-NE) and PJM. ISO-NE and PJM are responsible for maintaining resource adequacy and planning for electric reliability, operating the high-voltage transmission systems, and administering the competitive wholesale markets for electricity.

170. New England regularly imports electricity from New York to serve the region's growing demand. From January through July 2026, New England imported 4,903 gigawatt-hours of electricity from New York. Factoring in exports from New England to New York, New England relied on New York imports to serve about 6% of its energy load in the first seven months of 2026. In 2025, New England imported 6,527 gigawatt-hours of electricity from New York.

171. As described above, PJM, which administers the electric grid in Delaware, also imports electricity from New York to meet growing power demand in the region.

172. Offshore wind generation that delivers into NYISO is slated to be a critical part of New York's future electricity supply, and the Settlement Agreement and Lease cancellation jeopardize New York's ability to secure that supply. This constraint on new generation from offshore wind would negatively impact the New England States and Delaware by constraining NYISO's ability to export power to ISO-NE and PJM, a crucial resource for regional electric reliability, especially during constrained winter periods.

173. The Lease cancellation will also increase energy prices for the New England States and Delaware. BOEM established a finite number of offshore wind energy lease areas on the Atlantic Coast. Numerous East Coast States are interested in the development of offshore wind generation to meet energy reliability and emissions goals. For example, Connecticut's October 2021 Integrated Resources Plan identifies offshore wind energy development as a key strategy to achieving a reliable and affordable greenhouse gas emissions-free electricity supply by 2040, which is required under state law. Cancelling leases, including the Bluepoint Lease, will increase competition between interested States for access to a now-reduced supply of energy produced by offshore wind projects from remaining lease areas. The resulting competition is likely to increase the cost of offshore wind energy for all States.

174. The New England States and Delaware also stand to lose other benefits if the Lease cancellation and Settlement Agreement are not vacated.

175. Like many other states, the New England States and Delaware expect increased load growth over the coming years. ISO-NE's most recent forecast projects

the region's electricity consumption to increase by about 9% over the next decade. In Maine, demand for electricity is projected to double by 2050. In addition, New England is on its way to becoming a winter-peaking electric system, meaning electricity demand will be highest in the colder months. Winter months are already the period when the electricity supply is most constrained in New England because the region's natural gas infrastructure runs at close to maximum capacity on the coldest days.

176. When power plants that are already running cannot generate sufficient electricity, more expensive and more polluting generators, including oil- and gas-burning facilities, are brought online to produce electricity, resulting in more harmful emissions for New England communities and higher prices for New England electricity ratepayers. States are themselves ratepayers; for example, the five-year average electricity consumption of Connecticut executive branch agencies between fiscal years 2019 and 2023 was over 270,000 kilowatt-hours.

177. Offshore wind generation can reduce the need for high-cost, high-emissions electricity generators in winter months. Offshore wind has its highest capacity factor—can generate the most energy—during the coldest months, when the electric generating system in New England is most strained. Since New England relies on imports from New York during winter months, increasing the supply of offshore wind in New York could help ensure that New England is able to import sufficient capacity from New York to ensure winter reliability. Additionally,

increasing the winter electric capacity in New York with offshore wind generation could help reduce the cost of the electricity imported to New England.

178. Renewable energy generated in New York and New Jersey also creates environmental attributes that are traded in regional marketplaces through RECs.

179. For instance, wind energy projects and other eligible renewable energy projects in New York can qualify to generate Class I RECs under Massachusetts regulations. The electric distribution companies in Massachusetts purchase RECs to comply with the Commonwealth's Renewable Portfolio Standard, which requires obtaining specified percentages of electricity from renewable resources. In 2023, the most recent year for which data exists, Massachusetts settled, i.e., consumed, 1,739,531 Massachusetts Class I RECs from clean energy generators located in New York, of which the vast majority (nearly 1.3 million) were generated by wind resources.

180. Rhode Island also has a Renewable Energy Standard, and in 2024, the most recent year for which data exists, 25.2% of RECs settled in Rhode Island were from clean energy generators located in New York. That is the next-highest percentage after RECs generated in Rhode Island. 90% of those, or 22.68% of Rhode Island's total settled RECs, were from wind energy generated in New York.

181. Maine also has a Renewable Portfolio Standard, which requires that 80% of electricity be generated by renewable resources by the year 2030 and 100% clean energy by 2040. As a part of the Renewable Portfolio Standard program, electricity suppliers in Maine are required to purchase RECs. Delaware's Renewable

Portfolio Standard requires utilities to obtain 40% of their energy from clean sources by 2035. Vermont's Renewable Energy Standard demands that utilities procure all of their power from clean sources by 2035. Connecticut's Renewable Portfolio Standard, meanwhile, has existed in some form since 1998 and also relies on the purchase of RECs.

182. Offshore wind projects in New York and New Jersey would generate RECs for compliance with the renewable energy requirements of the New England States and Delaware. Without access to wind leases off the coasts of New York and New Jersey, there will be fewer RECs available for purchase, creating tighter supply and higher prices in the regional REC marketplace. In other words, a smaller group of projects will be capable of generating RECs, increasing the market price of RECs, and thus increasing costs for already burdened ratepayers.

183. Additionally, the foregone greenhouse gas emission reductions resulting from the Lease cancellation will exacerbate climate change and its resulting harms to the New England States and Delaware.

184. With 1,500 miles of coastline and 5.2 million people—73% of the Massachusetts population—residing in coastal communities, Massachusetts is particularly vulnerable to sea level rise and increasingly frequent extreme weather events attributable to climate change. Over the twenty-first century, Massachusetts is projected to experience approximately 4.0 to 7.6 feet of sea level rise, and estimates of coastal property damage for the Commonwealth are expected to reach over $1 billion per year by the 2070s. Flooding due to climate change will harm the

approximately 177 Commonwealth-owned parks, beaches, reservations, wildlife refuges, roads, parkways, piers, and dams and necessitate increasing expenditures to protect, repair, and rebuild the Commonwealth's properties. These expenditures are expected to increase to about $17 million annually in the 2030s.

185. Connecticut also feels the effects of climate change, including through flooding, extreme storms, property loss, and negative public health consequences.

186. The same can be said of Maine. Between March 2022 and May 2024, Maine experienced an extraordinary nine natural disasters, each severe enough to merit presidential disaster or emergency declarations. With 3,500 miles of tidal coastline, Maine has the fourth-longest coast in the continental United States, and this coastline provides a vital economic function for the State. Rising sea levels and a rapidly warming Gulf of Maine caused by climate change threaten coastal communities and the marine resources they depend on. By 2050, sea level rise is forecasted to cause more than $2.1 billion in lost gross domestic product and the elimination of thousands of jobs in tourism, fishing, and real estate. In addition, as the most heavily forested state in the country, Maine is susceptible to long and frequent power outages caused by severe storms, floods, and other natural disasters. These challenges are heightened by the increased risk of severe and unpredictable weather as a result of climate change.

187. Rhode Island is similarly affected by climate change, including through rising average temperatures and sea levels, rising precipitation rates, and rising coastal flooding events. The State's predisposition to flooding means that Rhode

Island is also disproportionately impacted by rising sea levels. The average sea level in Newport has risen by about 0.12 inches each year since 1930—an increase of nearly one foot in a century. Climate change also threatens Rhode Island's coastal resources and ecosystems. The State's rivers, bays, and ocean waters will continue to warm, threatening vulnerable species and vital industries. Moreover, increased frequency of extreme heat events due to climate change will create public health risks and strain Rhode Island's healthcare resources.

188. Thus, the Lease cancellation will inflict a range of harms on the New England States and Delaware.

**FIRST CLAIM FOR RELIEF**
**(Against Interior Defendants)**

**Administrative Procedure Act**

**The Lease Cancellation Is Arbitrary and Capricious in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

189. The States incorporate by reference the allegations in the preceding paragraphs.

190. Under the APA, a court is required to "hold unlawful and set aside" final agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

191. The Lease cancellation constitutes final agency action. *See* 5 U.S.C. § 704. Specifically, it "mark[s] the consummation of the agency's decisionmaking process" and is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).

192. The Lease cancellation is arbitrary and capricious because Interior Defendants failed to (1) provide a reasoned explanation for cancelling the Lease; (2) explain their change in position or account for the States' reliance interests; (3) address alternative means of achieving their objectives; or (4) provide a genuine justification for cancelling the Lease.

193. *First*, an agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

194. When an agency action is based on purported concerns about national security, "APA review . . . involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018).

195. The Lease cancellation is arbitrary and capricious because it lacks a reasoned explanation. Interior Defendants cited "classified national security concerns" as the justification for cancelling the Lease. Settlement Agreement at 2. But Interior Defendants did not specify what type of national security concerns the Lease implicated, nor did they explain why any concerns could not be adequately mitigated through BOEM's robust permitting process.

196. Interior Defendants also asserted that, if Bluepoint were to continue developing the Lease, BOEM would have ordered it "to suspend construction and operations of this project indefinitely due to national security issues, similar to the

suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." *Id.* But Interior Defendants arbitrarily failed to account for the fact that courts have preliminarily enjoined or stayed all five of the referenced suspension orders as not justified by imminent national security concerns.

197. Furthermore, it is arbitrary and capricious for Interior Defendants to depart from their obligations under the Lease agreement without explanation. The terms of the Lease, as amended, provide that any cancellation "predicated on a threat of serious irreparable, or immediate harm or damage, or an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities." Amended Lease § 8. Although Interior Defendants claim that they decided to cancel the Lease for national security purposes, they have not made any finding of "particularized harm" or determined that such harm can only be averted by completely cancelling the Lease.

198. *Second*, agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025) (citation modified).

199. In 2022, after years of analysis, interagency consultation, and environmental review, BOEM held a competitive offshore wind auction, pursuant to which Bluepoint was awarded the Lease in the New York Bight. The sale and award of the Lease were based upon and supported by an extensive record.

200. Interior Defendants failed to explain their change in position as to the purported national security concerns associated with offshore wind energy development in the New York Bight.

201. Interior Defendants also failed to consider the significant reliance interests that the States have formed based on BOEM's award of the Lease. The APA requires an agency that is reversing a prior policy or decision "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

202. The States have relied on the development of the Lease area as a component of their long-term strategies to support grid reliability, energy diversification, and climate goals. In cancelling the Lease, Interior Defendants did not even acknowledge these reliance interests, rendering the cancellation arbitrary and capricious for that reason as well.

203. *Third*, agencies are required to "address" alternative "way[s] of achieving [their] objectives" and give "adequate reasons" for abandoning those alternatives. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

204. BOEM offered the Lease area for sale after significant consultation with DOD and after determining that any potential wind energy project could sufficiently mitigate national security concerns by adopting appropriate mitigation measures.

205. Interior Defendants did not explain why the national security concerns that DOD purportedly identified required the Lease's complete cancellation and could not adequately be mitigated through site-specific measures, as previously contemplated by BOEM and DOD. Because Interior Defendants "too cavalierly sidestepped [their] responsibility to address reasonable alternatives, [their] action was not rational and must, therefore, be set aside." *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015).

206. *Fourth*, agencies are required to "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

207. The purported national security concerns that Interior Defendants described are not a genuine justification for cancelling the Lease.

208. Despite the 2005 amendments to OCSLA making the Outer Continental Shelf available for renewable energy production, including offshore wind, the Interior Secretary and President Trump have taken myriad actions to hinder wind energy development and made countless statements in public interviews and announcements opposing offshore wind energy for reasons that are unrelated to national security. These statements, and the many actions the Interior Secretary and President Trump have taken to stop the development of offshore wind energy, demonstrate that the Lease cancellation was based on political pressure and not any

consideration "made relevant by Congress" in OCSLA. *See D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971).

209. The rollout of the Lease cancellation and Settlement Agreement also demonstrates pretext. In its initial press release announcing the deal, Interior framed both actions as an attempt to redirect capital from "expensive, unreliable, intermittent energy projects" toward fossil fuels.[38] While the press release vaguely references "unaddressed national security concerns," it does not develop those concerns.

210. Furthermore, while the Settlement Agreement states that, absent the Lease cancellation, BOEM would have issued a suspension order "similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025," Settlement Agreement at 2, the Settlement Agreement fails to acknowledge that those suspension orders have all been preliminarily enjoined or stayed on the ground that they were not justified by any legitimate national security concerns either. *See* cases cited *supra* ¶ 106; Tr. of Prelim. Inj. Hr'g at 44:4–10, *Revolution Wind*, No. 25-cv-2999 (Jan. 12, 2026), ECF No. 65 (stating that the government's failure to explain the issuance of the suspension order "suggests that the stated national security reason may have been pretextual").

211. The Lease cancellation is, therefore, arbitrary and capricious and should be vacated and set aside under the APA.

[38] Press Release, Interior, *supra* note 35.

**SECOND CLAIM FOR RELIEF**
**(Against Interior Defendants)**

**Administrative Procedure Act**

**The Lease Cancellation Is Not in Accordance with NEPA and Not in Observance of Procedure Required by NEPA in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)**

212. The States incorporate by reference the allegations in the preceding paragraphs.

213. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, among other things, "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

214. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

215. Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See id.*; *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 93, 97 (1983).

216. Agencies are also required to consider alternatives to taking a proposed action, *see* 42 U.S.C. § 4332(C)(iii), (F), (H), and to identify measures that might mitigate adverse environmental impacts and incorporate measures necessary to mitigate adverse impacts, *see Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010).

217. To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies shall, with limited exceptions, prepare an environmental assessment. *See* 42 U.S.C. § 4336(b)(2).

218. If an agency determines that the proposed action will not have any significant effect, accounting for mitigation, it can issue a finding of no significant impact. *Id.* If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. *Id.* § 4336(b)(1).

219. Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id.* § 4332(C)(iii), (F), (H).

220. Interior Defendants' cancellation of the Lease constitutes a major federal action within the meaning of NEPA. *Id.* §§ 4332(C), 4336e(10).

221. Interior Defendants did not prepare an environmental assessment and finding of no significant impact, an environmental impact statement, or a record of decision regarding the Lease cancellation, nor did they otherwise conduct any NEPA review of the Lease cancellation or take a hard look at the reasonably foreseeable social, economic, and environmental impacts of the Lease cancellation and its alternatives.

222. Interior Defendants did not provide the public an opportunity to participate in a NEPA review of their decision to cancel the Lease.

223. As a result of their failure to conduct the required NEPA review, Interior Defendants failed to consider the full extent of the reasonably foreseeable impacts to the States of the Lease cancellation, including adverse impacts to grid reliability,

energy diversification, and other environmental benefits that would accrue to the States if the Lease area were developed.

224. Interior Defendants also failed to consider alternatives to cancelling the Lease, including any mitigation measures.

225. The Lease cancellation is, therefore, not in accordance with law and not in observance of procedure required by NEPA and should be vacated and set aside under the APA.

**THIRD CLAIM FOR RELIEF**
**(Against Interior Defendants)**

**Administrative Procedure Act and Outer Continental Shelf Lands Act**

**The Lease Cancellation Is Not in Accordance with OCSLA and Not in Observance of Procedure Required by OCSLA in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(A), (D), and OCSLA, 43 U.S.C. § 1349(a)(1)**

226. The States incorporate by reference the allegations in the preceding paragraphs.

227. Under the APA, a court is required to "hold unlawful and set aside" final agency action that is "not in accordance with law" and that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

228. OCSLA's citizen suit provision provides that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged

violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the [Interior] Secretary under this subchapter." 43 U.S.C. § 1349(a)(1).

229. The Lease cancellation violates OCSLA within the meaning of 43 U.S.C. § 1349(a)(1) and is not in accordance with OCSLA or the procedure required by OCSLA within the meaning of the APA because, in deciding to cancel the Lease, Interior Defendants (1) did not hold a hearing or make the required determination that cancellation is required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) agreed to pay Bluepoint the Lease's purchase price without calculating whether that would be the fair market value of the Lease at the time of cancellation, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (3) did not consider the factors they were required to consider under 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102 or otherwise demonstrate grounds for departure from regulations pursuant to 30 C.F.R. § 585.103; and (4) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

230. *First*, OCSLA specifies that a lease shall not be canceled unless the Interior Secretary determines, "after a hearing," that (i) "continued activity pursuant to such lease would probably cause serious harm or damage to life . . . to property, to any mineral . . . to the national security or defense," or "to the marine, coastal, or human environment;" (ii) "the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time;" and (iii) "the

advantages of cancellation outweigh the advantages of continuing such lease." 43 U.S.C. § 1334(a)(2)(A).

231. Interior Defendants did not hold a hearing before cancelling the Lease, nor did they find that continued activity pursuant to the Lease would probably cause serious harm to national security or defense or that the purported harm would not lessen to an acceptable extent within a reasonable period.

232. *Second*, OCSLA's compensation formula provides that, in the event of a lease cancellation, a lessee shall not be paid more than the fair market value of the lease at the time of the cancellation. *Id.* § 1334(a)(2)(C). It does not permit the federal government to simply refund the initial lease payment at the original purchase price, but instead requires compensation based on a specific statutory formula. The federal government did not apply the statutory compensation formula in agreeing to reimburse Bluepoint the $765 million it paid for the Lease.

233. *Third*, OCSLA requires the Interior Secretary to "ensure" that any activity carried out pursuant to Interior's renewable energy leasing authority "is carried out in a manner that provides for" a set of twelve enumerated factors, which include "prevention of waste" and "fair return to the United States for any lease." *Id.* § 1337(p)(4). Similarly, BOEM's regulations require BOEM to "ensure" that renewable energy activities carried out on the Outer Continental Shelf are done "in a manner that provides for and reaches a rational balance among" the twelve statutory factors, "none of which inherently outweighs or supplants any other." 30 C.F.R. § 585.102(a).

234. Interior Defendants decided to cancel the Lease without adequately considering the twelve factors they were required to "rational[ly] balance." For example, Interior Defendants did not evaluate whether the Lease cancellation, for which Interior Defendants requested $765 million—the full purchase price of the Lease—from the Judgment Fund, "[p]revent[ed] . . . waste, including economic waste," "protect[ed] . . . the rights of other authorized users of the [Outer Continental Shelf]," or ensured "[a] fair return to the United States." *Id.*; *see also* 43 U.S.C. § 1337(p)(4). Interior Defendants likewise failed to establish that any departure from regulations was warranted pursuant to 30 C.F.R. § 585.103.

235. *Fourth*, OCSLA requires the Interior Secretary to "notify the Governor of any . . . State" affected by "any action" taken by a federal agency "which has a direct and significant effect on the outer Continental Shelf or its development," 43 U.S.C. § 1334(h), and to "provide for coordination and consultation with the Governor of any State . . . that may be affected by a lease" under OCSLA's offshore wind leasing provision, *id.* § 1337(p)(7).

236. The States will, as described above, be affected by the Lease cancellation. But Interior Defendants failed to coordinate or consult with any of the affected States' Governors.

237. The Lease cancellation is, therefore, not in accordance with law and not in observance of procedure required by law and should be vacated and set aside under the APA.

238. Pursuant to 43 U.S.C. § 1349(a)(2)(A), on July 15, 2026, the States provided notice to Interior Defendants of these violations of OCSLA.

239. Accordingly, in addition to granting relief under the APA, the Court should compel compliance with OCSLA by vacating the Lease cancellation pursuant to 42 U.S.C. § 1349(a)(1).

**FOURTH CLAIM FOR RELIEF**
**(Against Federal Defendants)**

**Administrative Procedure Act and Outer Continental Shelf Lands Act**

**The Settlement Agreement Is Not in Accordance with OCSLA and Is in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and OCSLA, 43 U.S.C. § 1349(a)(1)**

240. The States incorporate by reference the allegations in the preceding paragraphs.

241. Under the APA, a reviewing court must set aside a challenged agency action that is found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

242. The Settlement Agreement constitutes final agency action reviewable under the APA. *See* 5 U.S.C. § 704; *Bennett*, 520 U.S. at 177–78; *see also Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993); *United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008).

243. An agency may not "circumvent[] federal law by entering into [a] settlement agreement." *Carpenter*, 526 F.3d at 1242.

244. The Settlement Agreement is not in accordance with OCSLA and is in excess of statutory authority within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C), and constitutes a violation of OCSLA within the meaning of OCSLA's citizen suit provision, 43 U.S.C. § 1349(a)(1).

245. As explained in ¶¶ 226–39 above, the Lease cancellation is not in accordance with OCSLA because Interior Defendants (1) did not hold a hearing before cancelling the Lease or make the required determination that cancellation is required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) agreed to pay Bluepoint the Lease's purchase price without calculating whether that would be the fair market value of the Lease at the time of cancellation, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (3) did not consider the factors they were required to consider under 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102 or otherwise demonstrate grounds for departure from regulations pursuant to 30 C.F.R. § 585.103; and (4) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

246. Because the terms of the Settlement Agreement ordered the unlawful Lease cancellation, the Settlement Agreement also violates OCSLA and is not in accordance with the law within the meaning of the APA. *See Exec Bus. Media*, 3 F.3d at 762 (explaining that the Attorney General's "plenary power [to settle claims] means absolute authority to pursue legitimate objectives and does not include license to agree to settlement terms that would violate the civil laws governing the agency").

247. The Settlement Agreement is also in excess of statutory authority.

248. No act of Congress authorizes Interior or DOJ to cancel an offshore wind lease on grounds unrelated to OCSLA.

249. No act of Congress authorizes Interior or DOJ to pay the holder of an offshore wind lease the full purchase price of the lease in exchange for the lease's cancellation. *Cf.* 43 U.S.C. § 1334(a)(2)(C) (OCSLA's compensation formula for lease cancellations).

250. The Settlement Agreement is, therefore, not in accordance with OCSLA and in excess of statutory authority and should be vacated and set aside under the APA.

251. Pursuant to 43 U.S.C. § 1349(a)(2)(A), on July 15, 2026, the States provided notice to Federal Defendants of this violation of OCSLA.

252. Accordingly, in addition to granting relief under the APA, the Court should compel compliance with OCSLA by vacating the Settlement Agreement pursuant to 42 U.S.C. § 1349(a)(1).

## FIFTH CLAIM FOR RELIEF

**(Against Federal Defendants)**

**Administrative Procedure Act**

### The Settlement Agreement Is Not in Accordance with the Judgment Fund Act and Is in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)

253. The States incorporate by reference the allegations in the preceding paragraphs.

254. Under the APA, a reviewing court must set aside a challenged agency action that is found to be "not in accordance with law" or "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

255. An agency may not "circumvent[] federal law by entering into [a] settlement agreement." *Carpenter*, 526 F.3d at 1242.

256. The Settlement Agreement is not in accordance with the Judgment Fund Act and is in excess of statutory authority within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C).

257. The Settlement Agreement violates the Judgment Fund Act's requirement that a payment be made from the Judgment Fund only if (1) the payment is not otherwise provided for, 31 U.S.C. § 1304(a)(1), and (2) the settlement is payable under 28 U.S.C. § 2414, 31 U.S.C. § 1304(a)(3)(A).

258. *First*, leaving aside the fact that the Lease cancellation is unlawful, payment of compensation for lease cancellation is already provided for under OCSLA, 43 U.S.C. § 1334(a)(2)(C), as well as under the Lease agreement. Because OSCSLA and the Lease agreement provide for payment, the Judgment Fund may not be utilized to compensate Bluepoint for the Lease cancellation.

259. *Second*, pursuant to 28 U.S.C. § 2414, compromise settlements may only be entered into for "claims referred to the Attorney General for defense of imminent litigation." Here, there was no imminent litigation nor substantive engagement by DOJ.

260. The Settlement Agreement states that BOEM would have issued a suspension order to Bluepoint "due to national security issues, similar to the

suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." Settlement Agreement at 2. It further states that Bluepoint "intends to immediately commence claims against the United States in the United States Court of Federal Claims asserting claims for breach of contract and/or uncompensated takings under the Fifth Amendment of the United States Constitution." *Id.*

261. However, even assuming that a breach-of-contract or takings lawsuit instead of an APA action were the proper vehicle for judicial review of a suspension order, no such lawsuit was imminent within the meaning of the Judgment Fund Act, 28 U.S.C. § 2414. To the contrary, both sides wanted to cancel the Lease. The only written communication Bluepoint sent to Federal Defendants articulating any legal claim against the United States or its agencies concerning the Lease was sent on February 16, 2026, after Interior Defendants had already made a settlement offer and drafted a settlement agreement.

262. Thus, the Settlement Agreement did not resolve a "legitimate dispute over either liability or amount," 3 Gov't Accountability Off., *supra* note 6, at 14-35, and did not justify the use of the Judgment Fund.

263. Moreover, a hypothetical lawsuit to challenge an agency action that had not even been threatened—here, the suspension or cancellation of the Lease—does not constitute actual or imminent litigation under the Judgment Fund Act. *See id.* at 14-34 to -35.

264. The Settlement Agreement is also in excess of statutory authority.

265. No act of Congress authorizes Federal Defendants to require the holder of an offshore wind lease to agree, in exchange for receiving a payment equivalent to the full purchase price of the lease, to invest that money, or the same amount of money, in unrelated activities, essentially redirecting money from one authorized use—offshore wind leasing—to a separate, unauthorized use favored by the President—oil and gas production.

266. The Settlement Agreement is, therefore, not in accordance with the Judgment Fund Act and in excess of statutory authority and should be vacated and set aside under the APA.

**SIXTH CLAIM FOR RELIEF**
**(Against Federal Defendants)**

**Administrative Procedure Act**

**The Settlement Agreement Is Not in Accordance with the Antideficiency Act, Purpose Statute, or Miscellaneous Receipts Act and Is in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**

267. The States incorporate by reference the allegations in the preceding paragraphs.

268. Under the APA, a reviewing court must set aside a challenged agency action that is found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

269. The Settlement Agreement is not in accordance with the Antideficiency Act, Purpose Statute, or Miscellaneous Receipts Act and is in excess of statutory authority within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C).

270. The Settlement Agreement violates the Antideficiency Act.

271. Specifically, in adopting the Settlement Agreement, Federal Defendants authorized an obligation exceeding the amount available in Interior's appropriations in violation of the Antideficiency Act, 31 U.S.C. § 1341(a)(1)(A), and also involved the federal government in a contract for the payment of money before an appropriation was made by Congress in further violation of the Antideficiency Act, *id.* § 1341(a)(1)(B).

272. The $765 million Bluepoint paid for the Lease should have been deposited in the U.S. Treasury. The U.S. Congress has not appropriated $765 million to Interior to compensate Bluepoint for the Lease cancellation.

273. The Settlement Agreement further violates the Miscellaneous Receipts Act, which requires that "[a]n official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim" and that "[a] person having custody or possession of public money . . . shall deposit the money without delay in the Treasury." *Id.* § 3302(b)–(c).

274. Under the Miscellaneous Receipts Act, once Bluepoint made its Lease payment to the federal government, Federal Defendants were obligated to deposit that payment into the Treasury and could not lawfully pay Bluepoint the "dollar-for-

dollar reimbursement" that the Settlement Agreement purports to authorize without a further appropriation from Congress, which never occurred.[39]

275. Finally, the Settlement Agreement violates the Purpose Statute's mandate that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

276. Congress did not appropriate $765 million for the purpose of unlawfully cancelling an offshore wind lease and redirecting that money toward oil and gas development, so the Settlement Agreement violates the Purpose Statute.

277. The Settlement Agreement is also in excess of statutory authority.

278. No act of Congress authorizes Federal Defendants to reimburse the holder of an offshore wind lease the full purchase price of the lease without congressional approval and direct the leaseholder to invest that money in unrelated activities.

279. The Settlement Agreement is, therefore, not in accordance with the Antideficiency Act, Purpose Statute, or Miscellaneous Receipts Act and is in excess of statutory authority and should be vacated and set aside under the APA.

---

[39] Press Release, Interior, *supra* note 35.

## SEVENTH CLAIM FOR RELIEF
## (Against Federal Defendants)

### Administrative Procedure Act and U.S. Constitution

### The Settlement Agreement Is Contrary to Constitutional Authority, in Violation of the Separation of Powers Doctrine, Spending Clause, and Appropriations Clause in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)

280. The States incorporate by reference the allegations in the preceding paragraphs.

281. The APA provides that a reviewing court "shall . . . hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

282. The Spending Clause vests exclusive authority in Congress "[t]o lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare to the United States." U.S. Const. art. I, § 8, cl. 1.

283. The Appropriations Clause further provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." *Id.* art. I, § 9, cl. 7.

284. The Settlement Agreement violates the Spending and Appropriations Clauses because it illegally redirects $765 million that was paid to the Treasury as part of a duly authorized offshore wind development program to fossil fuel activities for which Congress did not appropriate money, effectively usurping Congress's spending and appropriations powers.

285. By usurping Congress's spending and appropriations authorities, the Settlement Agreement violates the constitutional separation of powers doctrine.

286. Accordingly, the Settlement Agreement is contrary to constitutional authority and should be held unlawful and set aside.

## EIGHTH CLAIM FOR RELIEF
## (Against Federal Defendants)

### *Ultra Vires* Doctrine

### The Settlement Agreement Is *Ultra Vires*

287. The States incorporate by reference the allegations in the preceding paragraphs.

288. As explained in ¶¶ 240–86 above, no statute authorized the adoption or implementation of the Settlement Agreement.

289. The Settlement Agreement is, therefore, *ultra vires* and should be declared unlawful and vacated.

## PRAYER FOR RELIEF

The States respectfully request that this Court enter judgment:

1. Declaring that the Lease cancellation is arbitrary and capricious, not in accordance with law, and not in observance of procedure required by law and that the Settlement Agreement is not in accordance with law, in excess of statutory authority, and *ultra vires*;

2. Compelling compliance with OCSLA;

3. Vacating the Lease cancellation and Settlement Agreement;

4. Temporarily, preliminarily, and permanently enjoining Federal Defendants from implementing the Lease cancellation and Settlement Agreement; and

5. Granting such further relief as the Court deems just and proper, including, but not limited to, attorneys' fees and costs.

Dated: New York, New York
September 22, 2026

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

/s/ *Matthew Eisenson*
Monica Wagner
*Deputy Bureau Chief*
Matthew Eisenson
Libby Dimenstein*
*Assistant Attorneys General*
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-6351
Monica.Wagner@ag.ny.gov

Morgan Costello
*Deputy Bureau Chief*
Environmental Protection Bureau
The Capitol
Albany, NY 12224

FOR THE STATE OF NEW JERSEY

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ *Jessica Palmer*
Jessica Palmer*
*Assistant Attorney General*
Rachel Manning
*Deputy Attorney General*
New Jersey Division of Law
25 Market Street, P.O. Box 093
Trenton, NJ 08625
(609) 376-2740
Jessica.Palmer@law.njoag.gov
Rachel.Manning@law.njoag.gov

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

/s/ *Matthew I. Levine*
Matthew I. Levine
*Deputy Associate Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5250
matthew.levine@ct.gov

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

/s/ *Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Ralph K. Durstein III
Vanessa L. Kassab**
*Deputy Attorneys General*
Robin L. Jacobs
*Assistant Attorney General*
Delaware Department of Justice

820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General of Maine

/s/ *Caleb Elwell*
Caleb E. Elwell**
*Assistant Attorney General*
Scott Boak
*Natural Resource Division Chief*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.Elwell@Maine.gov
Scott.Boak@Maine.gov

FOR THE COMMONWEALTH OF MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

/s/ *Turner Smith*
Turner Smith**
*Deputy Chief & Assistant Attorney General*
Nathaniel Haviland-Markowitz
*Assistant Attorney General*
Jon Whitney
*Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General of Rhode Island

/s/ *Emily Van Auken*
Emily Van Auken**
*Environment and Energy Unit*
*Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
evanauken@riag.ri.gov

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General of Vermont

/s/ *Hannah Yindra*
Hanna Yindra**
*Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

* *Application for admission pending*

** *Application for pro hac vice admission pending*